**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LEILANI PAWLOWSKI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No: 09 C 6484** |
| **v.** ) | |
| ) | **Magistrate Judge Jeffrey Cole** |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiff, Leilani Pawlowski, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Pawlowski asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Ms. Pawlowski applied for DIB on September 29, 2006, alleging that she became disabled on March 1, 2003, due to degenerative disc disease, herniated discs, arthritis of the spine, depression, post traumatic stress disorder, panic attacks, and migraine headaches. (Administrative Record ("R.")100-102, 124). Her application was denied initially and upon reconsideration. (R. 62-68, 72-75). Ms. Pawlowski filed a timely request for a hearing. An ALJ held a hearing on May 19, 2009, at which Ms. Pawlowski, represented by counsel, appeared and testified. (R. 27-61). In addition, Brian Paprocki

testified as a vocational expert. (R. 21-32). On June 29, 2009, the ALJ issued a decision finding that Ms. Pawlowski was not disabled because she retained the capacity to perform light work with no more than occasional contact with co-workers, supervisors, and the public. (R. 9-26). This became the final decision of the Commissioner when the Appeals Council denied Ms. Pawlowski's request for review of the decision on August 18, 2009. (R. 1-3). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Pawlowski has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## EVIDENCE OF RECORD

### A.

### Vocational Evidence

Ms. Pawlowski was born on May 31, 1965, making her forty-four years old at the time of the ALJ's decision. (R. 100). She has a high school education and physical rehabilitation training. (R. 132). She has work experience as a nursing assistant, from 1996 through 2002. (R. 125). That job required heavy lifting – she had to move patients – and a good deal of walking. (R. 125). She stopped working because she "was having personal problems with her boyfriend and was in the process of moving." (R. 124). For the purposes of receiving DIB, Ms. Pawlowski's insured status expired March 31, 2006. (R. 120). Accordingly, the question is whether Ms. Pawlowski was disabled prior to that date. *Califano v. Sanders*, 430 U.S. 99, 101 (1977); *Allord v. Astrue*, 631 F.3d 411, 413 (7th Cir. 2011).

**B.**

**Medical Evidence**

In her four-page brief supporting her request for a remand, Ms. Pawlowski bases her claim that she is entitled to DIB exclusively on her back impairment. She cites only two pieces of evidence to support her position: an MRI report from February 21, 2006, and a report from a physician who treated her dated March 1, 2006. She contends that this evidence shows that the ALJ erred when he failed to find that her impairment met or equaled a listed impairment. Accordingly, any other arguments she could have made are deemed waived. *Carter v. Astrue*, 413 Fed.Appx. 899, 905, 2011 WL 917000, *6 (7th Cir. 2011); *Skarbek v. Barnhart,* 390 F.3d 500, 505 (7th Cir.2 004); *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001); *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000).

The facts before the ALJ are these: In February of 2004, Ms. Pawlowski fell off a snowmobile. A couple of days after the incident, she went to the emergency room of her local hospital in Mendota, Illinois. (R. 323-24). Upon examination, she had "absolutely no tenderness" over the midline vertebrae to palpation, full range of motion of all joints, and no neurological deficits (R.323-24). On February 18, 2004, Ms. Pawlowski saw Kwang Chung, M.D., her primary physician, and complained of pain in her neck, lower back, and legs; she also had a headache. (R. 454). The next day, CT scans of Ms. Pawlowski's spine showed "mild degenerative changes" at C5-C6, "mild degenerative changes" in her dorsal spine, and degenerative changes with a disc bulge at L4-L5, and a "small central disc protrusion at L5-S1." (R. 298). In March 2004, Ms. Pawlowski had two weeks of physical therapy. (R. 294-95). On her last visit, she said she was feeling "some better" and was discharged after she failed to return or contact the physical

therapist. (R. 293). Five months later, in August 2004, x-rays of Ms. Pawlowski's lumbar spine showed diffuse degenerative disc disease involving spurring from L2 to L5, but all vertebral body heights and alignment were maintained. (R. 292).

The next medical evidence pertinent to Ms. Pawlowski's back problems is from two-and-one-half years after that, in February 2006. She had MRIs of her thoracic and lumbar spines. The thoracic study revealed mild diffuse disc bulging at T12-L1, with mild central canal stenosis. The study was unremarkable otherwise. (R. 285). The lumbar study is the focus of Ms. Pawlowski's appeal – indeed, she cites to no other medical evidence in her brief. The results of that examination were:

FINDINGS: The study will be dictated under the assumption that there are five lumbar type vertebrae. There is desiccation of the L3-4, L4-5, and L5-S1 discs. Upper lumbar vertebrae are unremarkable in appearance. There is mild diffuse bulging of the T11-12 disc. Conus medullaris terminates at mid L1. At L3-4, there is a small broad-based left lateral and paramedian disc protrusion (herniation) with mild narrowing of the left half of the spinal canal. This narrows the origin of the left-sided neural foramen, but does not significantly efface the exiting left L3 nerve root. At L4-5, there is diffuse outward bulging of the disc that is slightly eccentrically greater towards the left. There is mild central canal stenosis when combined with the facet hypertrophic change. There is also mild bilateral neural foraminal narrowing present.

At L5-S1, there is a central posterior disc protrusion (herniation) with high T2-weighted signal intensity indicating an annular tear. Mild central canal stenosis is seen. There is also left lateral recess narrowing. However, there is convincing effacement of the Sl nerve roots or the exiting L5 nerve roots.

IMPRESSION:
Plain films are not available for comparison at the time of interpretation. Therefore, the study is dictated under the assumption that there are five lumbar type vertebrae. Small central posterior disc protrusion (herniation) at L5-S1 with evidence for an annular tear at the posterior margin of the disc protrusion. There is mild central canal stenosis. No focal nerve root effacement or significant neural foraminal narrowing is seen at this level.

> Diffuse disc bulging at L4-5 and small left paramedian and lateral disc protrusion (herniation) at L3-4. There is mild central canal narrowing at both of these levels and mild left L4-S neural foraminal narrowing without definite effacement of the exiting nerve root. There is also slight bilateral L4-5 neural foraminal stenosis without effacement of the nerve roots. Otherwise unremarkable MRI of the lumbar spine. No fracture is seen.

(R. 286).

The following month, on March 1, 2006, Ms. Pawlowski told pain management physician Deofil Orteza, M.D., that she had constant low back pain at "8" to "10" on a scale of 10, radiating to her hips and groin and, at times, toward her mid-back area. (R. 388). She said that walking, bending, and climbing stairs aggravated the pain. (R. 388). Upon examination, she exhibited a normal gait, negative straight leg raise ("SLR"), intact sensory and motor function, satisfactory heel/toe movement, and normal reflexes. (R. 389).

Dr. Orteza administered an epidural steroid injection on March 10, 2006. (R. 393). A couple of weeks later, Ms. Pawlowski reported "100% improvement" of her pain initially after the injection, later reduced to 80% alleviation; she was still able to ambulate without significant pain. (R. 395). Dr. Orteza reported that physical examination was "essentially unchanged" with no new physical findings (R. 395).

On March 24, 2006, Ms. Pawlowski went to the emergency room, complaining of a migraine headache. (R. 470). She was noted to be in no acute distress, "[s]itting comfortably on cart," and her examination showed 5/5 (normal) strength, normal gait, and normal neurological findings. (R. 471). Ms. Pawlowski also reported that she was presently taking care of her father and her mother, who was receiving chemotherapy for breast cancer, and so she was getting "very little rest." (R. 470).

On October 24, 2006, while she was visiting her father in the hospital, she went to the emergency room complaining of chest pains which she said she got from anxiety and panic attacks. (R. 466). She had an essentially normal EKG and the pain was "very unlikely to be cardiac," although it could not be completely ruled out at the time. (R. 467). The attending physician felt it was probably radiating from her back, or that it was a chest wall strain. (R. 467).

In January 2007, Dr. Virgilio Pilapil reviewed the record on behalf of the state agency. (R. 502-09). Dr. Pilapil felt that Ms. Pawlowski could perform light work – she could occasionally lift or carry up to 20 pounds, frequently lift or carry 10 pounds, and stand, walk, or sit for six hours out of a work day. (R. 503). In March 2007, Dr. Calixto Aquino performed a similar review and concurred. (R. 511).

### C.

### Administrative Hearing Testimony

### 1.

### Ms. Pawlowski's Testimony

At her hearing, Ms. Pawlowski testified she had two children, aged twenty-six and eleven, and that the eleven-year-old lived with her and her boyfriend. They had a two-story house. (R. 32). Her boyfriend's daughter drove her to the hearing; they made the fifty-minute trip without stopping. (R. 34).

She explained that her last job ended when her boyfriend "beat her up really bad," although he did not render her physically unable to continue with her work. (R. 35). Ms. Pawlowski explained that when her boyfriend beat her up, it triggered memories of when she was abused as a child. (R. 43). As a result, she has nightmares. (R. 43).

Ms. Pawlowski cataloged the reasons why she felt she was unable to work:

> I can't stand for a long period of time, I can't walk that far at a time, and a lot of pain in my back. My memory is very bad. I lay down a lot. That seems to – I try to ease the pain by laying down. I have panic attacks, I have migraines. There's not – I can't even function at home like I should be able to.

(R. 36). She estimated she could stand for 15 fifteen minutes at a time, and sit for 20. (R. 38). She could walk about half a block without having to stop. (R. 39). She used a cane to walk. (R. 46). She had to lie down at the beginning of her hearing (R. 38). She also alternated sitting and standing during the hearing. (R. 39). Ms. Pawlowski said she had a hard time lifting a gallon of milk. (R. 40). She has a driver's license and last drove three weeks prior to the hearing for a doctor's appointment. (R. 40). She also drives to visit her mother every two months. It's an hour trip, and she stops along the way and stays overnight. (R. 41).

Ms. Pawlowski said she can prepare simple meals, like making her son a sandwich. (R. 42). She starts to do the dishes, but can't finish. (R. 42). She avoided using stairs because she fell once on the stairs prior to getting her hip replaced. (R. 45). She experiences no side effects from her various medications. (R. 36).

**2.**

**Vocational Expert's Testimony**

Brian Paprocki then testified as a vocational expert ("VE"). The ALJ asked the VE to assume a person could perform light work, with only limited contact with the public, co-workers, and supervisors. (R. 55). The VE said that such a person could not perform Ms. Pawlowski's past work because the lifting requirements exceeded those of light work. (R. 55). But, such a person – with Ms. Pawlowski's work experience – could

perform jobs like clerical reviewer, sorter, or checker – all sedentary jobs. (R. 56). There were 5000 such jobs in the state, and 250,000 nationwide. (R. 57). A person limited to sedentary work with a sit/stand option could also perform these jobs. (R. 56). The VE added that she could also be a library page (3500 jobs statewide), which was light work. (R. 57). This list was not exhaustive. (R. 57). If that person had to miss four days of work per month, she would be unemployable. (R. 57). Similarly, the need to lie down during the work day was inconsistent with competitive employment. (R. 58).

**D.**

**ALJ's Decision**

The ALJ found that Ms. Pawlowski suffered from the following severe impairments: "degenerative disc disease ("DDD"), arthritis, depression, post traumatic stress disorder ("PTSD"), anxiety, migraines, and obesity." (R. 15). Through the date last insured, however, the ALJ determined that Ms. Pawlowski "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 17). He specifically determined that Ms. Pawlowski's DDD did not meet the criteria of listing 1.04, covering disorders of the spine, because there was no medical evidence establishing nerve root compression or the inability to ambulate effectively. (R. 17). The ALJ also addressed the requirements of listings 12.04 and 12.06, covering affective disorders and anxiety disorders, finding that Ms. Pawlowski had, at most, moderate restrictions stemming from her PTSD, anxiety, and depression. (R. 17).

The ALJ then reviewed Ms. Pawlowski's testimony at length. He gauged it against the medical evidence and found that record did not support the degree of

limitations she claimed. (R. 18). He also noted that, although Ms. Pawlowski had hip replacement surgery in August of 2008, this was well after the expiration of her insured status in March 2006. (R. 21). Prior to that, Ms. Pawlowski had a normal gait and motor function. (R. 21). The ALJ also noted that just prior to the hearing, Ms. Pawlowski appeared to be in distress, with difficulty walking and standing normally. During the hearing, she testified that she was getting worse. But after the hearing, the ALJ witnessed her standing and walking normally, exhibiting none of the signs of distress she had claimed just moments earlier. He felt that this, too, detracted from the credibility of her allegations. (R. 23). The ALJ also pointed to the fact that Ms. Pawlowski skipped a fair number of medical appointments and was non-compliant with prescribed physical therapy regimens. (R. 23).

The ALJ went on to consider the medical opinions in the record. He accorded significant weight to the reports of the reviewing physicians. (R. 24). He noted that there were no opinions from any physician who had treated Ms. Pawlowski suggesting she was disabled. (R. 24). The ALJ determined that, prior to the expiration of her insured status, Ms. Pawlowski had the capacity to perform light work that did not involve more than occasional contact with the public, co-workers, or supervisors. (R. 18). He then relied on the VE's testimony to find that, although Ms. Pawlowski could not perform her past work, she could perform other work that existed in significant numbers in the economy. (R. 25-26). As a result, the ALJ found her not disabled and not entitled to DIB. (R. 26).

# IV.

## DISCUSSION

### A.

### Standard of Review

We review the ALJ's decision directly, but we play an "extremely limited" role. *Simila v. Astrue,* 573 F.3d 503, 513 -514 (7th Cir. 2009); *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Schaaf v. Astrue,* 602 F.3d 869, 874 (7th Cir. 2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila,* 573 F.3d at 513 -514; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Since conclusions of law are not entitled to such deference, where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the

validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). "An ALJ must only 'minimally articulate his or her justification for rejecting or accepting specific evidence of a disability.'"*Berger*, 516 F.3d at 545; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). It is a "lax" standard. *Berger*, 516 F.3d at 545.

## B.

## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a Ms. Pawlowski is disabled:

> 1) is the Ms. Pawlowski currently unemployed;
> 2) does the Ms. Pawlowski have a severe impairment;
> 3) does the Ms. Pawlowski have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
> 4) is the Ms. Pawlowski unable to perform his past relevant work; and
> 5) is the Ms. Pawlowski unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila*, 573 F.3d at 512-13; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the

Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

As already explained, in arguing for a remand, Ms. Pawlowski wagers all on a single facet of the ALJ's opinion: his determination that she did not meet listing 1.04C. She has thus waived any other arguments she might have made. *Carter*, 2011 WL 917000, *6; *Skarbek,* 390 F.3d at 500; *Schoenfeld,* 237 F.3d at 793; *Shramek,* 226 F.3d at 811. Ms. Pawlowski contends that the ALJ ignored MRI evidence and failed to adequately explain his conclusion that the spinal condition did not meet listing 1.04.

First of all, Ms. Pawlowski is somewhat mistaken as to the requirements of listing 1.04C. She submits that "Listing 1.04C, Disorders of the Spine, is met and directs a finding of disabled, if three things are present: nerve root compression, spinal stenosis, and pseudoclaudication." (*Brief*, at 2). The listing provides as follows:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or

C. Lumbar spinal stenosis[1] resulting in pseudoclaudication[2], established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. It may be a subtle difference, but listing 1.04C requires stenosis and pseudoclaudication, while listing 1.04A requires nerve root compression. More important for present purposes, however, are the required accompanying findings.

Ms. Pawlowski argues that the ALJ based his finding that her impairment did not meet listing 1.04C on the February 21, 2006 MRI, which the ALJ said showed no nerve root effacement. (*Brief*, at 2). Ms. Pawlowski submits that the report showed "'convincing effacement of the S1 nerve roots or the exiting L5 nerve root.'" (*Brief*, at 2, citing R. 286). She interprets this as a statement that there was medical evidence of nerve root effacement and that the ALJ's contrary conclusion is mistaken. The difficulty with this contention is two-fold. First, it ignores the semantic inconsistency in the statement, itself. More importantly, it ignores another section of the report that is inextricably linked to the section that has been excised from the report. When the sentence is considered in context, the meaning accorded to it by Ms. Pawlowski is seen to be mistaken, as the ALJ obviously concluded.

"'All interpretation is contextual, and the body of knowledge that goes by the name of 'common sense' is part of the context of interpreting most documents. . . .'"

_____

[1] Spinal stenosis is a narrowing of the spinal column that causes pressure on the spinal cord, or narrowing of the openings (called neural foramina) where spinal nerves leave the spinal column.

[2] Pseudoclaudication is a result of narrowing of the lumbar spinal canal (lumbar spinal stenosis). This puts pressure on the spinal nerve roots, which control movement and sensation in the lower limbs. http://www.mayoclinic.com/health/pseudoclaudication/HQ01278.

*Vendetti v. Compass Environmental, Inc.*, 559 F.3d 731, 733 (7th Cir. 2009)(Posner, J.).

It is also a canon of common sense applicable to all written documents that a literal interpretation that produces absurd results is to be avoided. *See Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir. 2002); *In re Comdisco,* 434 F.3d 963 (7th Cir. 2006). Ms. Pawlowski's interpretation of the single-sentence cited in her brief is contrary to both these precepts, which have applicability beyond merely contracts and statutes. No reason appears that should make them inapplicable in this context, and there is every reason why these interpretative rules should be utilized here.

In the "FINDINGS" section of the report, Dr. Kim wrote:

> At L5-S1, there is a central posterior disc protrusion (herniation) with high T2-weighted signal intensity indicating an annular tear. Mild central canal stenosis is seen. There is also left lateral recess narrowing. *However, there is convincing effacement of the Sl nerve roots or the exiting L5 nerve roots.*

(R. 286)(Emphasis supplied).

It is immediately apparent that the last sentence cannot be accorded the meaning ascribed to it by Ms. Pawlowski. The use of the word "[h]owever" at the beginning of the sentence and the use of the disjunctive "or" later in the sentence, is not merely odd phrasing; the sentence, as written, makes no sense. The first two sentences note disc protrusion, an annular tear, and left lateral recess narrowing. If the final sentence was intended to mean that there *was* "convincing [nerve] effacement," the sentence would not have begun with the word, "[h]owever."

"However" is defined by the Webster's Encyclopedic Unabridged Dictionary of the English Language, New Deluxe Edition, as "nevertheless; yet; on the other hand; in spite of that." The example given is "we have not yet won; however, we shall keep on

trying." Thus, the sentence in Dr. Kim's report that begins with "[h]owever" must have been intended to say something contrary to or in contrast with the findings expressed in the preceding three sentences regarding nerve root effacement flowing from disc protrusion, annular tearing, mild stenosis, and recess narrowing.

That this was Dr. Kim's intent is further apparent from his use of the word "or" later in that sentence. If there *was* "convincing" effacement, it would have made no sense to have used the disjunctive phrasing that was in fact employed. There was either effacement to S1 or L5 or both. But the sentence as written leaves it impossible to say which. No clinician would leave the matter indeterminate, as the last sentence does when read literally, and it is fatuous to say that Dr. Kim could not distinguish between the S1 nerve root and the exiting L5 nerve root.

The only interpretation of the FINDINGS section of the report that does not lead to absurd results and that makes sense of Dr. Kim's phrasing is that there is a word missing from the sentence. And that word can only be "no." Properly read, the sentence was intended to say that there was *no* convincing effacement of the Sl nerve roots *or* the exiting L5 nerve roots. The word "no" makes intelligible the use of the words, "however" and "or." That this is what Dr. Kim meant to say is confirmed by the "IMPRESSION" section, which comes immediately after the "FINDINGS" section and which is clearly intended as an explanation of the "FINDINGS" section . Here, Dr. Kim writes:

> Small central posterior disc protrusion (herniation) at L5-S1 with evidence for an annular tear at the posterior margin of the disc protrusion. There is mild central canal stenosis. *No focal nerve root effacement or significant neural foraminal narrowing is seen at this level.*

(R. 286)(Emphasis supplied).

Unfortunately, the plaintiff has ignored Dr. Kim's unequivocal statement in this section of the report, although it could scarcely be more significant to the interpretive question that her brief raises. The chief determinant of the meaning of all language is context. Scalia, A Matter of Interpretation: Federal Courts and the Law, 135 (1997). Or as Cardozo memorably put it, there is a "transforming power of association for phrases as for men." *Marchant v. Mead-Morrison Mfg. Co.,* 252 N.Y. 284, 299, 169 N.E. 386 (1929). *Cf. Williams v. Taylor,* 529 U.S. 420, 435 (2000).

While the ALJ did not go through this analysis, he did not have to. Dr. Kim's "IMPRESSIONS" were sufficient and the typographical mistake in the "FINDINGS" section obvious. "'Judges need not explain" or "belabor the obvious," "even briefly." *United States v. Moore*, 641 F.3d 812, 823 (7th Cir. 2011); *United States v. Gary,* 613 F.3d 706, 709 (7th Cir.2010). *Cf., Eastman Kodak Co. v. Photaz Imports Ltd., Inc*. 853 F.Supp. 667, 674 (W.D.N.Y. 1993)("'[J]udges are competent to understand the obvious....'"). The ALJ's conclusion that "on February 21, 2006, . . . . [a]n MRI of her lumbar spine showed: a "small" disc protrusion (herniation) at LS-S1 with evidence of an annular tear and "mild" central canal stenosis, but no nerve root effacement or significant neural foraminal narrowing," (R. 20), comports with the explicit conclusion of Dr. Kim and is the only sensible reading of the report, taken as a whole.[3] *Cf. United States v. Herrera*, 120 F.3d 269 (9th Cir. 1997)("when read in its entirety the existence of a typographical mistake is clear."). In relying on the "IMPRESSION" section of Dr. Kim's report, the ALJ did not err and more than satisfied the "logical bridge" requirement.

---

[3] All judges make mistakes. *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor,* 115 F.3d 1332, 1339 (7th Cir. 1997). This case shows that doctors do also.

Judicial review of an ALJ's decision is not a game of Gotcha, and "we give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it." *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000). "No principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989)(Posner, J.)("So the administrative law judge's opinion is vulnerable. But that is nothing new" and alone does not require remand); *People of the State of Illinois v. I.C.C.,* 722 F.2d 1341, 1348 (7th Cir.1983)(Posner, J.)("But if we are sure that the agency would if we remanded the case reinstate its decision-if in other words the error in its decision was harmless-a reversal would be futile, and *Chenery* does not require futile gestures").[4]

As it turns out, however, even if the ALJ erred by not pedantically explaining the obvious, the omission is not "critical" to his analysis. Listing 1.04C requires that a claimant's condition result "in inability to ambulate effectively, as defined in 1.00B2b." Under that section, the inability to ambulate means:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit

---

[4] Even where there are unexplained "tensions in [a doctor's] report," *Fisher,* 869 F.2d at 1057, remand is not inevitable. In *Fisher,* the "administrative law judge did not remark on any of these anomalies" or "explain why a psychiatrist's evaluation is to be preferred to that of a clinical psychologist". Nonetheless, the court of appeals affirmed the district court's affirmance of the Social Security Administration's denial of benefits since the record itself was clear.

The situation here is unlike that in *Craft v. Astrue,* 539 F.3d 668 (7th Cir. 2008), where the ALJ ignored a psychiatrist's dire assessment of a claimant's mental condition and, without any explanation, focused exclusively on other seemingly contradictory findings. The court of appeals said that it could not tell whether the ALJ considered and rejected this piece of evidence because she did not mention it. 539 F.3d at 678. The instant case does not present the problem that concerned the court in *Craft,* where there was contradictory evidence. Here, there is no contradictory evidence.

> independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 CFR Pt. 404, Subpt. P, App. 1, §1.00B(2)(b).  The ALJ correctly stated that there was no evidence that Ms. Pawlowski suffered an inability to ambulate effectively (R. 17), and pointed to examination results showing "she exhibited a normal gait, negative straight leg raise, intact sensory and motor function, satisfactory heel/toe movement, and normal reflexes."  (R. 20).  That was in March of 2006.

The ALJ also referred to two other medical visits.  One was in May of 2006, when Ms. Pawlowski was noted to have "walked without a limp, and exhibited no sensory or motor deficits, no effusion and only very slight limitation at extreme of full flexion, but otherwise full knee range of motion." (R. 16).  The other was in July of 2004, when she was said to be "ambulatory, unassisted with a steady gait."  (R. 16).  And, finally, as the ALJ also pointed out, the first evidence in the record of Ms. Pawlowski requiring a cane to walk came well after the expiration of her insured status.  (R. 21).

Ms. Pawlowski counters that there is evidence that she lost the ability to ambulate effectively.  That evidence consists solely of her testimony and her complaints to Dr. Orteza.  But the ALJ clearly disbelieved the extent of her complaints, as he was entitled to do, *Sarchet,* 78 F.3d at 307, especially in light of the contradictory medical evidence – a point specifically noted by the ALJ.  "[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration."  *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *see also Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Similarly, Ms. Pawlowski's complaints to her physician are not medical evidence, but merely her own description of her symptoms. Subjective complaints to a treating source are "the opposite of objective medical evidence and an ALJ is not compelled to accept them." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). *See also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)("medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."); *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir.2001) ("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations.").

Dr. Orteza's actual examination findings – which the ALJ clearly considered (R. 20) – were a normal gait, reflexes, and motor function. (R. 389). To the medical evidence, the ALJ added his observations of how Ms. Pawlowski behaved when she thought she was out of his view. As with discrepancies between medical evidence and complaints, this too, is a valid reason to doubt a claimant's testimony. *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir.2000)(". . . we have repeatedly endorsed the role of observation in determining credibility and refuse to make an exception in this situation."). The ALJ also pointed to the fact that Ms. Pawlowski was non-compliant with her prescribed physical therapy regimen. This, too, is a valid factor, but might be tempered by an inability to pay or, in the case of medication, bad side effects. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). While the ALJ did find out that Ms. Pawlowski had medical insurance through public aid (R. 34), he didn't specifically ask why she failed to attend many physical therapy sessions and doctor's appointments. But,

even if that amounts to a flaw, it is not enough to overturn the ALJ's credibility finding, which is otherwise amply supported. *Simila*, 573 F.3d at 517; *Berger*, 516 F.3d at 546.

So, the central issue with regard to this evidence remains Ms. Pawlowski's lack of credibility. Ms. Pawlowski wisely does not claim that the ALJ's credibility finding was "patently wrong," so it cannot be disturbed. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). In short, the ALJ was correct in stating there was no evidence of an inability to ambulate. That, alone, would mean Ms. Pawlowski had failed to prove her condition met the listings. The result would have been the same no matter how the ALJ interpreted Dr. Kim's statements regarding nerve effacement. So even if the ALJ's treatment of the MRI report was error, it was harmless. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

Given Ms. Pawlowski's confusion about the requirements of the listings, it may be that she meant to argue that her condition met listing 1.04A, rather than listing 1.04C. Listing 1.04A, as already noted, does specifically require evidence of nerve root compression. But, like listing 1.04C, the criteria do not end with the first thing enumerated. To meet listing 1.04A, Ms. Pawlowski would had to have presented evidence of limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight leg raising tests. 20 CFR Pt. 404, Subpt. P, App.1, §1.04A. As the ALJ explained in his decision, examination revealed "negative straight leg raise, intact sensory and motor function, satisfactory heel/toe movement, and normal reflexes . . . ." (R. 20). So, again, if the ALJ erred in his interpretation of Dr. Kim's MRI report, Ms. Pawlowski still would not have met the listing, and any error would be harmless.

Finally, Ms. Pawlowski raises the argument that the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion – an argument that has become *de rigeur* in these cases. She says the ALJ simply made the conclusory statement that her condition did not meet the listing and failed to explain why. (*Brief*, at 2). As already discussed, however, the ALJ clearly cited evidence to explain his findings. His decision allowed for a meaningful review, and that is all that is required. *Jones*, 623 F.3d at 1160.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

**ENTERED:** _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 8/25/11